**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| **DAWN MERRIMAN, as PARENT AND NATURAL GUARDIAN of D.M., A MINOR,** 921 Victory Avenue **Baltimore, Maryland 21225** **(Baltimore City)** | **COMPLAINT AND ELECTION FOR JURY TRIAL** |
| **Plaintiff,** | |
| **vs.** | Case No.: ___1:25-cv-03130___ |
| **ROBLOX CORPORATION** **3150 South Delaware Street** **San Mateo, California 94403** | |
| **Defendants.** | |

**COMPLAINT**

Plaintiff D.M., a minor, via their parent and natural guardian, Dawn Merriman, hereby brings this action against the above-captioned Defendant Roblox Corporation to recover damages arising from the severe injuries sustained because of D.M.'s use of and addiction caused by Defendant's video game Product. In support thereof, Plaintiff alleges and states:

**INTRODUCTION**

1.      Many modern video games are fun and engaging adventures that allow individuals to immerse themselves in the world of games. This litigation is not a war on fun. Nor does it seek to curtail the creation and enjoyment of entertaining video games. Rather, this litigation seeks to hold Defendant accountable for failing to warn and failing to include available safeguards against the known risks to minors associated with excessive use of its video game

Product and choosing instead to implement programming that exacerbated these risks to increase its profits.

## PARTIES

2.      Plaintiff's guardian Dawn Merriman is, and at all times relevant to this action was, a citizen and resident of the State of Maryland whose principal place of residence is Baltimore City.

3.      Dawn Merriman is the mother of D.M. and serves as their representative in this lawsuit. Plaintiff Dawn Merriman is not pursuing any claims in her individual capacity.

4.      Plaintiff D.M., a minor, is, and at all times relevant to this action was, a citizen and resident of the State of Maryland with a principal place of residence located in Baltimore City. D.M. is ten years old at the time of filing this lawsuit.

5.      Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 3150 South Delaware Street, San Mateo, California 94403.

6.      Roblox Corp. is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, and/or prepared Roblox at their California office. Roblox Corp. also distributed, marketed and/or supplied Roblox, either directly or indirectly, to members of the general public, including to Maryland residents and Plaintiff D.M.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction over this action under 28 U.S.C.S. § 1332(a) because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

8.     This Court has personal jurisdiction over Defendant Roblox Corp. because it caused tortious injury to D.M. in the State of Maryland.

9.     Venue is proper in this Court under 28 U.S.C.S. § 1391 because a substantial part of the events and omissions giving rise to D.M.'s claims occurred in this District.

## GENERAL FACTUAL ALLEGATIONS

**I.     Extensive Video Game Usage Damages Adolescent Brains**

10.     For almost two decades, research on the interaction between video game usage and the adolescent brain has shown that extensive usage has a severe impact on the adolescent brain, including loss of grey matter, which leads to severe physical and mental effects on the child. Many of these effects are indicators or consequences of Internet Gaming Disorder ("IGD"), which is the addiction to video gaming.

11.     One of the ways that the impact of video game usage is studied is research about the role dopamine plays in the brain during gameplay.

12.     Video games can and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by substance use or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between nerve cells in the brain, as well as between the brain and the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors, and particularly neurodivergent minors, whose brains are still developing. Increased frequency of dopamine releases can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

13.    The repetitive release of dopamine creates, reinforces, and strengthens a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the video games more and more, first at an increasing rate and then with compulsive desire until the impulse to use the video games develops into a disordered use or addiction.

14.    Those dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inhibitory control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, mal and/or undernutrition, and other harmful effects, all to the severe detriment and damage to the minor, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers.

15.    Additional research on the impact of video games reports physical changes to the brain and brain matter as a result of gameplay.

16.    Research has shown that prolonged use of video games damages the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. Research has also concluded that such use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

17.    Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated

with substance abuse and addiction, such as hangovers, changes in mood, inability to adapt, withdrawal, conflict, and recurrence symptoms.

18.    Empirical studies indicate that gaming disorders are associated with detrimental health-related outcomes.

19.    Brain imaging studies have shown that excessive use of video games negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

20.    Other studies have shown that disordered and/or excessive use of video games leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

21.    During adolescence, the prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization. This region of the brain does not reach maximum capacity until the age of 25 to 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals. The lack of full development of the prefrontal cortex is arguably why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes, minors are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which further impacts frontal lobe development.

22.    Brain imaging studies related to IGD have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated

with emotions, perception, memory, and motor control). Specifically, studies showed several regions of the brain demonstrated reduction in grey-matter volume in gaming disorder participants.

23.     Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that engaging with video games activates regions of the brain in a manner similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

24.     Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain because of prolonged use of video games. Several regions showed activation in response to video game cues in gaming disorder participants, as demonstrated in more than two studies.

25.     Structural studies of the brain have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) may arise because of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

## II.    Gaming Addiction Is a Recognized and Diagnosable Condition

26.     Addiction to and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[1]

27.     Nationally recognized institutions such as the Cleveland Clinic and the National Center for Biotechnology Information (NCBI) also recognize video game addiction and categorize the addiction as falling under the general category of IGDs.[2]

28.     As of 2022, "Gaming disorder"—disordered use of and/or play with video games— is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[3] "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

---

[1] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).
[2] Shabina Mohammad, Raghad A Jan, & Saba L Alsaedi, *Symptoms, Mechanisms, and Treatments of Video Game Addiction*, Cureus (Mar. 31, 2023).
[3] Other disorders found in that subcategory include alcoholism and gambling addiction.

### III. Psychological Techniques and Programming Choices Game Developers Use to Create Addiction, Drive Microtransactions, and Increase Profits

#### A. <u>Operant Conditioning</u>

29.     Modern game developers, including Defendant, employ(ed) and/or consult(ed) child development experts and/or psychologists to assist with the design and development of their games and/or gaming platforms, and to analyze the effects of game design on user behavior.

30.     Upon information and belief, modern game developers, including Defendant, knew that minors were engaging with their Products and utilized their child development experts and/or psychologists to design its game to attract and addict minors to their Products.

31.     Upon information and belief, the analyses performed by Defendant's behavioral experts and/or psychologists revealed that when video games that are programmed to incorporate "operant conditioning" that targets users' dopamine receptors, the operant conditioning triggers users' desire to hyperfocus on using and overusing the Product.

32.     "Operant conditioning" is a form of behavioral manipulation that uses rewards and punishments to influence behavior. Through operant conditioning, rewarded behavior is likely to occur more frequently, while the frequency of punished behavior decreases.

33.     In the context of video games and gaming platforms, video game developers including Defendant relied upon these psychological analyses to program their games and platforms to employ operant conditioning in order to addict players and manipulate them into making profitable decisions for the game developers, such as spending more time playing their respective games and engaging in microtransactions.

#### B. <u>Development and Use of Patented Programming</u>

34.     In addition to relying on their own studies to make programming decisions, game developers, including Defendant, helped develop, licensed, and otherwise utilized patented

programming algorithms in their games and gaming platforms that were intended to addict players, increase time spent in-game, and drive microtransactions. By way of example:

a. U.S. Patent No. 20160005270-A1, is a "matchmaking" patent that uses historical player data and analytics to create a system for driving microtransactions in a multi-player game. This "matchmaking" patent is used in Products, like Defendant's at issue here, and can be summarized as a "system and method … that drives microtransactions in multiplayer video games. The system may include a "microtransaction arrange match[] to influence game-related purchases. For instance, the system may match a more expert/marquee player with a junior player to encourage the junior player to make game-related purchases of items possessed/used by the marquee player. A junior player may wish to emulate the marquee player by obtaining weapons or other items used by the marquee player." The system for driving microtransactions is comprised of a host computer having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the host computer to: identify an in-game item that is relevant to a first player, but not yet possessed by the first player for gameplay in a multi-player game; identify a second player that possesses the in-game item; and match the first player and the second player to play in a gameplay session to encourage purchase of the in- game item by the first player, wherein the matching is based on: (i) the relevance of the in-game item to the first player, and (ii) the possession of the in-game item by the second player.

b. U.S. Patent No. 9623335-B1 utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game," such as a virtual shop "present[ing] high-end, or expensive virtual items." This prevents

the game from losing the opportunity "to extract additional value from users inclined to spend money."

c.  U.S. Patent No. 9138639-B1 creates a dynamic pricing system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

d.  U.S. Patent No. 9795886-B1 allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

e.  U.S. Patent No. 9403093-B2 is a "dynamic" pricing patent that encourages users to make purchases on multiple game devices or platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating to play the game."

f.  U.S. Patent No. 9626475-B1 creates an exclusive, time-limited, event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

g.  U.S. Patent No. 9666026-B1 provides offers that "decrease in value based on previous

acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the first offer."

h. U.S. Patent No. 9808708-B1 adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

35. Upon information and belief, many game developers, including Defendant, license one or more of the above technology patents, and/or other patents similar thereto, and incorporate said technology into their Products with the intention of creating addiction and profits.

### C.     Operant Conditioning, Patented Technology, and Game Design Choices Increase Time Spent In-Game and Revenue Generated by Microtransactions

36. Using operant conditioning and patented technology, video game developers, including Defendant, use algorithms to analyze the behavior of the user and customize their experience, or guide the user to reach a flow state while playing, to maximize the time spent in-game, during which the user is bombarded with solicitations to purchase additional in-game downloadable game content.

37. In so doing, video game developers, including Defendant, exploit an information asymmetry between themselves and the user. This allows game developers, including Defendant, to use their knowledge of the user's skill, game-related preferences, available funds, and/or playing and spending habits to present in-game downloads and purchase offers that are predetermined to maximize a user's expenditure of real money.

38.     For example, in some instances, video games, including Roblox, include a feature that increases the difficulty of the game as the player's skill increases, thereby increasing the amount of time it takes for the player to achieve repeated success. During the extra time it now takes for the player to achieve success, the player is exposed to repetitive advertisements for desirable in-game items that can be obtained through points earned over time through continued and prolonged gameplay or instantaneously using in-game or real-world currency.

39.     Likewise, game developers, including Defendant, may offer "season passes" in which players can pay real-world money to obtain access to exclusive items that are available to be purchased for a limited time through points earned during game play. Game developers incentivize players that have purchased "season passes" to engage in prolonged game sessions during the "season" to earn sufficient points to collect each exclusive item. Once again, however, by design game difficulty is dynamic, resulting in players needing to play longer to obtain the results they desire, all while being exposed to advertisements for additional in-game products.

40.     Critical to Defendant's revenue, such continued features with little to no restriction on the amount of spending in the payment interface also makes it easy for minor users to fail to understand the value of the actual money being spent, which allows for more easeful and continuous spending of real money.

41.     These and other features—which the Defendant knowingly incorporates into the design aspects of its Product—use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated use and increased spending by users (especially minors who are vulnerable to these tactics) and which serve to deepen their disordered or addicted use.

#### IV.  Addictive Game Design Features Cause Significant Harm to Minors

42.    The human population most vulnerable to the combination of game developers'
microtransaction methodology and addictive operant conditioning design features are minors;
minors who are neurodivergent are even more susceptible to becoming addicted. Video game
developers, including Defendant, knew this, but nonetheless purposefully designed their games
and platforms to exploit that vulnerable population, causing injury and detriment, including to
Plaintiff D.M. Doing so has yielded the intended results: video game developers, including
Defendant, have earned extraordinary financial revenue from this group of users as a result of
placing their addictive Products that are targeted to minors into the stream of commerce.

43.    Defendant knew or was aware, or should have known and should have been aware,
that its Product was dangerous and harmful to users, particularly minors, when used as intended
and in a reasonably foreseeable manner. In fact, Defendant intentionally caused and designed its
Product to most effectively cause users with developing brains to become addicted or disordered
in their desire to use the Product. To that end, upon information and belief, Defendant employed
behavioral psychologists and/or neuroscientists to develop a Product that incorporated design
features premised upon psychological tactics engineered to keep users engaged in using the
Product for longer and longer periods of time.

44.    The microtransactions and other technologies, designs, features, mechanisms,
algorithms, artificial systems, programs, and other processes Defendant incorporated into its
Product were implemented in a manner such that users (and, when users are minors, their
caretakers) do not understand and have no way of understanding (or uncovering through
reasonable diligence) that their use of the Product involves engagement with intentionally

addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the Defendant.

45.    There is no disclosure of the addictive mechanisms designed as a part of Defendant's Product at the time it is downloaded to allow prospective users to make informed decisions as to whether using the Product is desirable, appropriate, safe, or worth the potential risk.

46.    At all times material hereto, Defendant targeted consumers/purchasers, including minors, and specifically including Plaintiff D.M. herein, to use its Product and engage in microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

47.    Defendant, with knowledge of D.M.'s age and residency, targeted Plaintiff D.M. with manipulative programming to prolong use of its Product in hopes of inducing D.M. to engage in microtransactions during their use of the Product. As a result of D.M.'s use of Defendant's Product, and because of the addictive design features incorporated into the Product, D.M. was injured and damaged as herein alleged.

## V.    Roblox

### A.    <u>Roblox Gameplay Basics</u>

48.    Roblox is a video game and platform that was developed and published by Roblox Corp. The game was released in September 2006.

49.    At present, Roblox has approximately 111.8 million daily active users.[4]

50.    More than 45% of the consumers playing Roblox are under age 13.[5]

---

[4] Roblox Corp. Homepage, https://corp.roblox.com/ (last visited Sept. 3, 2025).
[5] *The Roblox User Base,* Roblox Creator Hub, https://create.roblox.com/docs/production/roblox-user-base (last visited July 24, 2025).

51.     Roblox is available to play on gaming consoles, computers, tablets, and cellular devices.

52.     Roblox is an online game that is free to download and play, making it easily accessible to all users, including minors.

53.     Individuals that wish to play Roblox must create a Roblox account.

54.     In order to create a Roblox account, individuals must include a birthdate, username, and password.

55.     Users of any age can create a Roblox account, though users cannot enter a birth year later than 2020. Roblox Corp. does not require users to verify their age when creating a Roblox account. Accordingly, users can represent that they are younger or older than their actual age.

56.     Users are also not required to obtain parental consent to create a Roblox account nor to play Roblox.

57.     After creating an account, all users are assigned a default player avatar – a cartoonish character that represents the individual user within certain games. This avatar can be customized with different outfits and appearances through in-game purchases made in the in-game Roblox store using in-game currency known as Robux.

58.      Robux can be obtained by (a) purchasing it with real currency; (b) receiving a recurring stipend given to users with a Roblox Premium membership; and (c) earning it from selling "game passes" or "developer Products" to other Roblox players.

59.     Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

60.     Roblox has hosted over 3.7 billion virtual transactions on its platform.[6]

61.     Roblox Corp. offers a Premium Membership option to users, which can be purchased with Robux. A Premium Membership offers users exclusive items and discounts, Premium-only levels within certain games, the ability to trade items with other users, and a stipend of Robux that defrays the purchase cost of the Premium Membership.

62.     Roblox gameplay is unique and different from many "traditional" games. When an individual "plays" Roblox, they open the Roblox program, where they are presented with a myriad of games (known as "experiences") they can play.

63.     Roblox Corp. groups each "experience" into four content-based categories: Minimal, Mild, Moderate, and Restricted. Once the user creates an account, the user can access almost all of Roblox's content if they represent they are over 8 years old. If a user is under 9 years old, they are only able to view Minimal and Mild content. If the user indicates they are between the ages of 9 and 17, the only content not accessible is content specifically marked as "Restricted," which requires ID verification to view.

64.     These "experiences" or games available on Roblox are further sorted into different genres/categories, including but not limited to: Sports, Role-Playing Games (RPG), Fighting, First Person Shooters (FPS), Horror, Comedy, Military, and Naval.

65.     The games available to any particular user will vary based upon the age they entered when generating their account and what games Roblox's algorithm recommends to the user.

66.     While within the Roblox platform, players can jump back and forth between the games Roblox presents to each player.

---

[6] *Earning on Roblox*, Roblox Creator Hub, https://create.roblox.com/docs/production/earning-on-roblox (last visited Aug. 23, 2024).

67.     Most games available on the Roblox platform were not directly made by Roblox Corp. Rather, the Roblox platform includes a game design feature, as detailed below, whereby Roblox teaches users and provides tools for users to generate their own games and make them available on the Roblox platform for others to play.

### B.     Roblox Corp.'s 2024 and 2025 Changes to Safety Settings

68.      In November of 2024, Roblox Corp. announced, "major updates to [its] safety systems and parental controls."[7] It claimed these updates were implemented because "safety is and always has been foundational to everything [it does] at Roblox."[8]

69.     The changes Roblox Corp. made in 2024 included new labels for categories of content, changes to viewable content for each age group, parental controls for minors' screen time usage, and a new minimum age at sign up.

70.     In April of 2025, Roblox Corp. implemented further updates to parental controls, stating that "[s]afety underpins everything we do at Roblox, particularly the safety of our youngest users."[9] These 2025 updates included the ability for guardians to view their minor's top Roblox games the minor has played and how long the minor spent in each game for the past week. Guardians can now also block specific games and experiences for their minors.

71.     Prior to the 2024 changes, Roblox Corp. allowed all users, regardless of age, to view any content other than that marked "17+." In fact, users as young as 2 or 3 could view any content on the platform that was not protected by age verification. Beginning in 2024, Roblox

---

[7] *Major Updates to Our Safety Systems and Parental Controls*, Roblox Newsroom, https://corp.roblox.com/newsroom/2024/11/major-updates-to-our-safety-systems-and-parental-controls (last visited Nov. 25, 2024).

[8] *Id.*

[9] Matt Kaufman, *New Tools for Parents to Personalize Their Child's Experience on Roblox*, Roblox Newsroom, https://corp.roblox.com/newsroom/2025/04/new-parental-controls-on-roblox (last visited Apr. 7, 2025).

Corp. imposed stricter limits on the content viewable to users that represent they are younger than 9 years old. Even after these changes, however, users that represent they are older than 8 can still access all content not marked as "17+".[10]

72.    Until 2024, Roblox Corp. did not provide parental controls for minors' screen time and usage on Roblox. Roblox Corp. could have allowed parent-imposed time limits, but instead chose not to allow parents to set time limits on their minor's Roblox account for over eighteen years of operation.

73.    Until approximately September 2024, Roblox Corp. allowed users to represent their age as young as one year old and have access to virtually all content on the platform. Even now, parents whose minors are over the age of 12 cannot set restrictions on spending limits, set time limits, change privacy settings, or manage friends and communication on their minor's account.[11] Roblox Corp.'s changes to parental controls in 2025 did not address these failures to protect and limit minor users.

74.    Until 2025, Roblox Corp. did not provide guardians with the ability to block specific games and experiences, nor for guardians to view how much time their minor spends in each respective game.

75.    The implementation of these restrictions and changes by Roblox Corp. in 2024 and again in 2025 demonstrates its understanding of its responsibility to implement such restrictions and safety measures, and further, demonstrates how easily Roblox Corp. can implement restrictions and safety measures in general. These changes also demonstrate that Roblox Corp.

---

[10] "17+" content is now known as "Restricted" content on Roblox.
[11] *Major Updates to Our Safety Systems and Parental Controls*, Roblox Newsroom, https://corp.roblox.com/newsroom/2024/11/major-updates-to-our-safety-systems-and-parental-controls (last visited Apr. 8, 2025).

has control over access to not only its platform, but the games users are able to access on its platform. The changes that Roblox Corp. implemented in 2024 and in 2025 did not require game by game review by Roblox Corp., but instead were implemented as system-wide updates.

76.     Roblox Corp. admits in publicly filed documents that it has the ability to dynamically apply relevant content filters, anti-addiction rules, payment limits, parental consent requirements, and certain other regional requirements.

77.     Despite its ability to implement anti-addiction rules, specific parental controls, payment limits, and restrictions, upon information and belief, Roblox Corp. instead chooses not to implement those restrictions in order to increase its profit.

**C.     Roblox is Marketed to Minors Yet Lacks Adequate Safety Features**

78.     Roblox Corp. does not inform users of the inherent risks involved with using and playing Roblox, specifically excluding that Roblox was designed to addict users to their extreme harm and detriment.

79.     Instead, Roblox Corp. provides users, potential users, and guardians false assurances of safety. For example, Roblox Corp. states that:

a.   it has built a platform with safety at the foundation.

b.   it spends hundreds of millions of dollars each year to meet its safety mission.

c.   users should learn about how Roblox's commitment to safety and civility helps students grow.

d.   it strives to make its systems as safe as possible by default, especially for its youngest users.

e.   its age recommendations for its Product are grounded in child development research and informed by industry standards, essentially confirming its reliance on scientific research about adolescent development and content consumption.

f.  its recommendations are created by examining global industry standards and consulting child development experts; and

g.  its Product is part of the new era of teaching and learning, and teaches educators how to pilot Roblox in their class or school district, assuring parents, educators, and students that its Product is safe for use of all ages.

80.    While Roblox does feature some parental controls in its Product, almost all of these parental controls can only be applied to minors' accounts if the minor is under 13, despite Roblox Corp.'s alleged desire to create one of the safest online environments.

81.    None of Roblox's parental controls (aside from content restrictions) are automatically applied or required when a minor creates an account. A minor can easily create an account and bypass any parental controls if their guardian is unaware of the account or the ability to enable parental controls.

82.    Roblox Corp. states on its website that:

> ▼ **First, get the go-ahead**
>
> If you're under 13 years old, please get permission from your parent or guardian to use Roblox. You shouldn't use our Services without their go-ahead.

83.    Despite its acknowledgement that users under 13 should not "use [its] services without their [guardian's] go-ahead," Roblox Corp. provides absolutely no safeguards or requirement of parental consent when making an account, even if that user represents they are under the age of 13. Further, this instruction regarding parental permission does not reasonably coexist with Roblox Corp.'s acknowledgement that its game was created for children.

84.    Roblox Corp. could, but chooses not to, require express parental consent for minors under 13 to create an account. Despite its acknowledgement that minors should get permission from guardians before using its Product, Roblox Corp. fails to require parental consent.

85.     Additionally, Roblox Corp. only allows a parent to enable parental controls through their minor's account or a linked account. To engage with/change any parental control settings or link a minor's account to theirs, the parent must first know that the account exists, and subsequently know the log in information of their minor, or the minor must enter the parent's email address into their Roblox account.[12]

86.     Until 2024, Roblox Corp. did not provide parental controls for minors' screen time and usage on Roblox. Roblox Corp. could have allowed parent-imposed time limits, but instead chose not to allow parents to set time limits on their minor's Roblox account.

87.     Further, once a user reaches the age of 13, parents can no longer impose parental controls on their minor's account.[13]

88.     Roblox Corp. could, but does not, allow any users to set self-imposed time limits on their Roblox account.

89.     The only Roblox content that is restricted by ID verification is "Restricted content." Though Roblox Corp. has imposed content limits on users under the age of 9, a minor under the age of 9 could easily create an account with a fictitious birth date representing they are over 8 and access most of Roblox's games. Without age verification at account creation and/or to view specific content, a minor under 9 can easily bypass Roblox's restrictions.

90.     At account setup, Roblox's website contains no warnings labels, banners, or messaging informing minor users or their guardians of the known risks and harms stemming from the excessive use of Roblox Corp.'s Product. Users are not provided with information

---

[12] *Parents: How to Link Your Child's Account*, Roblox, https://en.help.roblox.com/hc/en-us/articles/30428321333140-Parents-How-to-Link-Your-Child-s-Account (last visited July 24, 2025).
[13] *What Happens As I Get Older On Roblox?*, Roblox Support, https://en.help.roblox.com/hc/en-us/articles/30428367965460-What-happens-as-I-get-older-on-Roblox#:~:text=In%20most%20regions%2C%20after%20a,limits%20will%20no%20longer%20apply. (last visited July 24, 2025).

regarding potential physical and mental harm associated with compulsive gameplay.

91.    During gameplay, there are no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of Roblox Corp.'s Product. Users are not provided with information regarding potential physical and mental harm associated with compulsive gameplay.

92.    Roblox Corp., while touting safety as a core value of its company, chooses not to implement meaningful safety features, understanding that changes in parental controls and safety features will reduce time spent in-game and, ultimately, revenue.

### D.    <u>Roblox Corp.'s Monetization of Intentionally Addictive Game Design</u>

93.    Roblox Corp. designed the game-creation aspect of its Product to allow users to create their own Roblox video games for play and purchase by other Roblox users, including minors. Though third parties create the games, Roblox Corp. profits from all monetary transactions that occur within these third-party created games.

94.    Roblox Corp. constructed a "Creator Hub" on its website. The Creator Hub provides users with instructions (including "how-to" videos) from Roblox Corp. on how users can create their own Roblox games and also provides users with tools that enable or facilitate creation of their own Roblox games.

95.    Users that create their own games are referred to as "Creators" or "Developers."

96.    Roblox Corp.'s website boasts that its top ten Developers made, on average, $33.9 million in 2024.[14]

---

[14] *Earn on Roblox,* Roblox Creator Hub, https://create.roblox.com/docs/production/earn-on-roblox (last visited July 24, 2025).

97.     Roblox Corp. reports its Developers have been collectively paid $3.3 billion since 2018.[15]

98.     Roblox Corp. encourages creators to incorporate into games the tools that Roblox Corp. created, and makes available within Roblox's game design studio. To assist in teaching current and potential Developers how to utilize Roblox's tools and Roblox Studio, the Roblox Corp.'s Creator Hub includes literature under topics such as: "Publishing," "Promotion," and "Monetization." The Creator Hub's purpose is to teach potential creators "everything [they] need to know about creating on Roblox."[16]

99.     The "Monetization" topic on the Creator Hub includes literature on monetization strategies, immersive ads, subscriptions, passes, developer Products, avatar items, engagement-based payouts, paid access, and private servers.[17]

100.    The Creator Hub discusses "Engagement-Based Payouts," which lets the Developer "earn Robux based on the share of time that Premium members engage in an experience."[18]

101.    Roblox Corp.'s Creator Hub encourages Developers to keep users playing their game(s) for as long as possible to increase the Developer's profits, and in turn, Roblox Corp.'s.

102.    The Creator Hub provides instructions on how Developers can access their "payout data," which will help the Developer "understand what factors drive Premium subscribers to

---

[15] *Id.*
[16] *Creation Overview*, Roblox Creator Hub, https://create.roblox.com/docs/creation (last visited July 24, 2025).
[17] *Monetization*, Roblox Creator Hub, https://create.roblox.com/docs/production/monetization (last visited July 24, 2025).
[18] *Engagement-Based Payouts*, Roblox Creator Hub, https://create.roblox.com/docs/production/monetization/engagement-based-payouts (last visited July 24, 2025).

[their] experiences."[19] Analytics on the website provide data and insight to grow a Developer's audience.[20]

103.    One of the tools Roblox Corp. created and is featured on Roblox's Creator Hub is a "season pass." As described above, a season pass allows players to pay real-world money to obtain access to exclusive items that are available to be purchased for a limited time through points earned during game play. Compl. ¶ 66. Roblox Corp.'s Creator Hub encourages the use of season passes to motivate players to continue playing Developers' games, create a sense of urgency regarding items offered for the season, and create anticipation for the next season to keep players coming back.[21]

104.    Roblox Corp. therefore encourages and gives step-by-step instructions for Developers to incorporate Roblox's harmful and addictive algorithms, programming, and strategies, including microtransactions and features without warnings or time restrictions, as described hereafter, into each of their games resulting in Roblox Corp. earning significant profits from each game it helped design, host, and promote on its platform.

105.    Beyond working with Developer to create additive games, Roblox Corp. purposefully designed other features within its Product to intentionally addict users.

106.    Roblox Corp. designed an achievement system within Roblox that rewards users for completing various tasks or actions. These achievements are not based upon a user's time or actions within a third-party game "experience," but rather the user's time and actions on Roblox's platform itself. For example, a user playing Roblox can unlock an achievement for

---

[19] *Id.*
[20] Roblox Creator Hub, https://create.roblox.com/ (last visited July 24, 2025).
[21] *Season Pass Design*, Roblox Creator Hub. https://create.roblox.com/docs/production/game-design/season-pass-design (last visited July 24, 2025).

playing Roblox for three days in a row, ten days in a row, and twenty days in a row. Likewise, users can earn an achievement for playing Roblox for an hour. When the user unlocks an achievement, they can see what percentage of other users have unlocked the achievement. This system is designed to keep users engaged with the game, incentivize long periods of gaming repeated across multiple days, and ultimately increase Roblox Corp.'s profits.

107.    Roblox Corp. knows its Product incorporates addictive designs that pose risks of causing users to develop dangerous and disordered use and overuse of the Product. In fact, Roblox Corp. developed addictive strategies, game designs, and monetization schemes, implemented them on the Roblox platform itself and then instructed those developing "experiences" for its platform to incorporate those addictive features into their games that would be offered to minors. Nonetheless, Roblox Corp. chose to not inform the consuming public at large, users, or guardians of minors who are users, of such risks.

108.    Upon information and belief, Roblox Corp. designed Roblox and the addictive strategies, game designs, and monetization schemes offered in its game and game design studio in conjunction with psychologists, neuroscientists, and other behavioral experts to intentionally maximize the likelihood of addiction of minor and neurodivergent users.

109.    Roblox Corp. admits to consulting child development experts for aspects of game development.

110.    Further, Roblox Corp. actively employs or has employed psychologists and behavioral experts within its People Science and Analytics department and User Experiences department.[22]

---

[22] *See, e.g.*, Erica Snow, LINKEDIN, https://www.linkedin.com/in/erica-snow-phd-75272b39 (last visited July 24, 2025); Philip Simmons, LINKEDIN, https://www.linkedin.com/in/philippsimmons (last visited

111.    The use of operant conditioning, the use of microtransactions within an otherwise free Product, a lack of warnings about the harms of use, no self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Roblox Corp. employing harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Roblox Corp.'s knowledge that abuse and compulsive use of its Product by foreseeable users, *i.e.*, minors and neurodivergent individuals, can and did lead to users, including Plaintiff D.M., suffering impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Roblox Corp. marketed and misrepresented Roblox as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

## **PLAINTIFF-SPECIFIC ALLEGATIONS**

112.    D.M. is a ten-year-old minor who is addicted to video games as a result of their use of Roblox. D.M. began playing Roblox at age six. Shortly after D.M. began playing Roblox, as a result of the addictive design of the game, D.M. quickly became addicted to playing video games, including Roblox.

113.    During their years of gaming, D.M. has purchased Roblox currency, Robux, to utilize on the Roblox platform. Because of their addiction that was caused by Roblox, D.M. cannot control the amount they play or spend in video games. On average, D.M. spends more time playing video games than engaging in any other activity, including going to school,

---

July 24, 2025); Carissa Kang, LINKEDIN, https://www.linkedin.com/in/carissakang (last visited July 24, 2025).

spending time with family members, exercising, or engaging in other hobbies because D.M. is addicted to playing video games and must continue to play in order to avoid withdrawal symptoms.

114.     As a result of their gaming addiction, D.M. has experienced severe emotional distress, diminished social interaction, change in eating pattern, gamer's rage, lack of interest in hobbies, academic decline, withdrawal symptoms, and an inability to stop gaming among other injuries. D.M. also threatened self-harm and became verbally and physically abusive to others. D.M.'s gaming addiction is also a substantial factor in the decline of D.M.'s academic performance and has resulted in the need for diagnostic testing and an Individualized Education Plan ("IEP") at school.

115.     Plaintiff D.M.'s usage of Defendant's Product is compulsive and disordered, and they are incapable of restraining their own usage, as are the people around them. Any attempt to remove D.M. from their games, including Roblox, is met with severe withdrawal symptoms including anger, injurious behavior to themself and others, threats of self-harm, property damage, and refusal to maintain hygiene or sleep.

## COUNT I – STRICT PRODUCT LIABILITY – DESIGN DEFECT

116.     At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, and/or otherwise distributing its video game Product used by D.M., which is defective and unreasonably dangerous.

117.     The video game Product that Defendant placed into the stream of commerce was defectively designed. The Product was designed to cause addictive and compulsive use, including for minors. The Product is not reasonably fit, suitable, or safe for its intended purpose.

118.    The defective condition of Roblox rendered it unreasonably dangerous and/or not reasonably safe. The foreseeable risks outweigh the benefits associated with Defendant's designs.

119.    The defects in Defendant's designs were present in the Product when the Product left the hands of Defendant and when it was released to the general public to be used in an intended and foreseeable manner.

120.    Roblox, as designed, was unreasonably dangerous, posed a substantial likelihood of harm, and was therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, the Product's design including addictive operant conditioning, the Product's design lacking warnings about the risk of addiction, the Product's design lacking safeguards such as user-imposed time restrictions on gameplay, the Product's design lacking proper minor age verification, and the Product failing to operate as a reasonable user would expect.

121.    Defendant designed its Product to be addictive and take advantage of the chemical reward system of users' brains to establish compulsive use and addiction.

122.    Defendant's Product was expected to and did reach Plaintiff D.M. without substantial change in the condition in which it was designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

123.    D.M. used Defendant's Product, Roblox, in an intended and reasonably foreseeable manner, and the Product was not materially altered prior to its use.

124.    Defendant knew or, by the exercise of reasonable care, should have known that minors, including D.M., would use the Product without anyone inspecting the Product for addictive or other dangerous features.

125.    Reasonable users of Defendant's Product would not expect, and Plaintiff D.M. herein did not expect, that said Product would pose risks of severe physical and mental harm.

126.    Reasonable users of Defendant's Product would not expect that Defendant knew about risks of severe physical and mental harm and nevertheless chose to place its Product into the stream of commerce.

127.    Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing its Product without the harm-causing features listed above, while still providing an optimal gaming experience.

128.    At the time Defendant's Product was designed, developed, distributed to D.M., and played, safer alternative designs existed that were entirely feasible.

129.    Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize and reduce harm caused by its Product by implementing elements that include, but are not limited to:

a. Robust age verification;

b. Effective parental controls;

c. The removal of barriers to the enactment of parental controls;

d. Warnings of health effects of use and extended use upon sign-up;

e. Opt-in restrictions to the length and frequency of sessions;

f. Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

g. Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

h. Self-imposed limits for microtransactions; and

i.  Others as set forth herein.

130.  Instead, Defendant designed its Product to aggressively addict users with features that increase use time, frequency of use, and profit to Defendant, all to the detriment of users' well-being.

131.  Defendant's defective Product, and D.M.'s use of Defendant's Product, was the direct and proximate cause of D.M.'s injuries and harm that include, but are not limited to, impacts on brain function, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts.

132.  Plaintiff D.M.'s injuries—physical, emotional, and economic—were reasonably foreseeable to Defendant at the time of the Product's design, marketing, distribution, and operation.

133.  As a direct and proximate result of Defendant's defective Product, Plaintiff D.M. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. D.M.'s injuries are permanent and will require more medical care and treatment in the future.

134.  Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff D.M.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT II – STRICT PRODUCT LIABILITY – FAILURE TO WARN

135.  At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing,

advertising, promoting, controlling, supplying, leasing, and/or otherwise distributing its video game Product used by D.M., which is defective and unreasonably dangerous.

136.    Defendant knew that its Product is and was harmful, capable of causing and in fact was designed to cause compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries.

137.    Defendant knew, or should have known, that ordinary consumers such as Plaintiff D.M. would not have realized the potential risks of its Product.

138.    Defendant knew, or should have known, that the use of Roblox was dangerous, harmful, and injurious when used by Plaintiff D.M. in a reasonably foreseeable manner.

139.    Defendant owed a duty to warn consumers of the foreseeable risks and dangers of its Product that Defendant knew were present, but were not obvious or known to users, especially underage users, or their caregivers, or any average member of the consuming public.

140.    At the time Defendant's Product left Defendant's control, it did not include – nor has it ever included – warnings that the Product poses an unreasonable risk of harm to users, particularly minors.

141.    Defendant failed to provide timely and adequate warnings, instructions, and information by, including but not limited to:

a.  failing to ensure the Product included warnings regarding its addictive design that was accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with its use;

b.  failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

c. failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Product, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities;

d. failed to issue warnings to consumers regarding the dangerous risks of the Product even after the sale and/or download of its Product; and

e. representing that the Product was and is safe for use, when in fact, Defendant knew or should have known that its Product was designed to cause minors to engage in excessive use until they developed an addiction or disordered compulsion to use the Product.

142.    Defendant's failure to adequately warn about its defective Product created a danger of injuries described herein that was reasonably foreseeable at the time of the design, development, and dissemination of the Product.

143.    A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff D.M. of the dangers of its Product.

144.    Had Plaintiff D.M. and/or Dawn Merriman been aware that the Product could cause significant harm such as impacts on brain function, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Dawn Merriman would not have allowed D.M. to use or continue to use Defendant's Product. Likewise, D.M. would not have used or continued to use Defendant's Product. Alternatively, if Defendant had adequately warned or instructed D.M.'s guardian and/or D.M., they would have taken precautions when using Defendant's Product in order to eliminate or mitigate the risk of harm.

145.    The addictive nature of Defendant's defective Product and failure to warn about said Product was a substantial factor in Plaintiff D.M.'s significant injury, harm, damages, and economic loss, and is the actual and proximate cause of said harm. Plaintiff D.M. will continue to suffer such harm, damages, and economic loss in the future. D.M.'s injuries are permanent and will require more medical care and treatment in the future.

146.    Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff D.M.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT III – NEGLIGENCE – DESIGN

147.    At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, and/or otherwise distributing its video game Product used by D.M., which is defective and unreasonably dangerous.

148.    Defendant knew, or should have known, that the use of Roblox was dangerous, harmful, and injurious when used by Plaintiff D.M. in a reasonably foreseeable manner.

149.    Defendant knew, or should have known, that ordinary consumers such as Plaintiff D.M. would not have realized the potential risks and dangers of Roblox.

150.    Defendant owed a duty to all reasonably foreseeable users to design a safe Product.

151.    Roblox, as designed, was unreasonably dangerous, posed a substantial likelihood of harm, and was therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, the Product's design including addictive operant conditioning, the Product's design lacking warnings about the risk of addiction, the Product's design lacking

safeguards such as user-imposed time restrictions on gameplay, the Product's design lacking proper minor age verification, and the Product failing to operate as a reasonable user would expect.

152. Defendant breached its duty by failing to use reasonable care in the design of its Product by negligently designing Roblox to specifically appeal to and to take advantage of minors, who were particularly unable to appreciate the risks of the Product.

153. Defendant breached its duty by failing to use cost effective, reasonably feasible alternative designs that would make its Product less addictive and harmful to minors, including but not limited to:

    a. Robust age verification;

    b. Effective parental controls;

    c. The removal of barriers to the enactment of parental controls;

    d. Warnings of health effects of use and extended use upon sign-up;

    e. Opt-in restrictions to the length and frequency of sessions;

    f. Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

    g. Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

    h. Self-imposed limits for microtransactions; and

    i. Others as set forth herein.

154. Instead, Defendant designed its Product to aggressively addict users with features that increase use time, frequency of use, and profit to Defendant, all to the detriment of users' wellbeing

155.    A reasonable company under the same or similar circumstances would have designed a safer product.

156.    Plaintiff was harmed directly and proximately by Defendant's failure to use reasonable care in the design of its Product.

157.    As a direct and proximate result of Defendant's negligence, Plaintiff D.M. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. D.M.'s injuries are permanent and will require more medical care and treatment in the future.

158.    Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff D.M.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT IV – NEGLIGENCE – FAILURE TO WARN

159.    At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, and/or otherwise distributing its video game Product used by D.M., which is defective and unreasonably dangerous.

160.    Defendant knew, or should have known, that the use of its Product was dangerous, harmful, and injurious when used by Plaintiff D.M. in a reasonably foreseeable manner.

161.    Defendant knew or, by the exercise of reasonable care, should have known that its Product posed risks of harm to youth. These risks were known and knowable considering Defendant's internal information and knowledge regarding its Product at the time of the Product's development, design, marketing, promotion, advertising, and distribution to D.M.

162.    Defendant knew, or should have known, that ordinary consumers such as Plaintiff D.M. would not have realized the potential risks and dangers of Defendant's Product.

163.    At the time Defendant's Product left its control, the Product did not include – nor has it ever included – warnings that the Product poses an unreasonable risk of harm to users, particularly minors.

164.    Had Plaintiff D.M. and/or Dawn Merriman been aware that the Product could cause significant harm such as impacts on brain function, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Dawn Merriman would not have allowed D.M. to use or continue to use Defendant's Product. Likewise, D.M. would not have used or continued to use Defendant's Product. Alternatively, if Defendant had adequately warned or instructed D.M.'s guardian and/or D.M., they would have taken precautions when using Defendant's Product in order to eliminate or mitigate the risk of harm.

165.    Because Defendant's conduct created the dangerous conditions on its platform, Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its Product in a manner which the manufacturer should reasonably foresee.

166.    Moreover, Defendant breached its duty of care owed to Plaintiff D.M. and other foreseeable users through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its Product. Those breaches include but are not limited to:

   a.   designing the Product to be more addictive and to target specific individuals based on information obtained and retained by Defendant and/or third-parties;

b.  failing to implement effective parental controls;

c.  failing to implement reasonably available means for users or their parents to monitor for and limit or deter their own excessive frequency or duration of use of the Product, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.  failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable Products and upgrades and in-game purchases and/or microtransactions;

e.  failing to implement reasonably available means to allow users or their parents to limit or deter use of Products by minors during ordinary times for school or sleep; and

f.  Failing to warn users that Defendant's Product causes addiction, compulsive use, and/or other physical and mental injuries.

167.    A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

168.    As a direct and proximate result of Defendant's breach of duty to provide adequate warnings, Plaintiff D.M. was harmed and sustained the injuries set forth herein.

169.    As a direct and proximate result of Defendant's negligence, Plaintiff D.M. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. D.M.'s injuries are permanent and will require more medical care and treatment in the future.

170.    Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and

without regard for human life or Plaintiff D.M.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT V – NEGLIGENCE

171.    Defendant had a duty to exercise reasonable care and caution for the safety of individuals using its Product, including D.M.

172.    Defendant, in its role as Product designer, developer, manufacturer, marketer, and seller, and otherwise engaging in activity culminating in placing its Product into the stream of commerce, owed a duty to exercise ordinary care in designing and placing the Product into the stream of commerce.

173.    Defendant also owed a duty to warn users of the hazards of using its Product, which Defendant knew were present in its Product, though such hazards were not obvious to users and particularly not so to minor users.

174.    Defendant's duties also include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

175.    Defendant created a harmful and addictive Product and failed to engage in the development of safer alternative designs.

176.    For its own profit, Defendant chose not to engage in the development of safer alternative designs.

177.    Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

178.    Defendant's failure to act in developing a safer alternative design constitutes a breach of its duty of reasonable care.

179.    Defendant knew, or should have known, that its Product is harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

180.    Defendant was and is negligent in failing to provide adequate warnings about the dangers associated with using its Product and in failing to warn users, and the parents of users who are minors, including D.M., about how and when, if ever, to safely use its Product.

181.    Defendant was and is negligent in failing to provide users, and their caregivers in the case of users who are minors, including D.M., the tools to ensure that its Product is used in a limited and safe manner.

182.    As a result of Defendant's breach of the herein identified duties and resulting negligence, Plaintiff D.M. suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendant's Product.

183.    Defendant's breach of duty of care to Plaintiff D.M. was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

184.    As a direct and proximate result of Defendant's negligence, Plaintiff D.M. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. D.M.'s injuries are permanent and will require more medical care and treatment in the future.

185.    Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff D.M.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## PRAYER

**WHEREFORE**, Plaintiff prays for judgment against Defendant as to each relevant cause of action as follows:

1.    For Plaintiff D.M.'s general damages, including pain and suffering and emotional distress, medical and related expenses, and past and future economic and special damages, all according to proof at the time of trial;

2.    For Plaintiff D.M.'s prejudgment interest according to proof as provided by law;

3.    For Plaintiff D.M.'s costs of suit herein;

4.    For attorneys' fees;

5.    For exemplary and/or punitive damages according to proof at the time of trial; and,

6.    For such other and further relief, whether at law or in equity, that this Court deems just and proper.

## ELECTION FOR JURY TRIAL

Plaintiff hereby elects a trial by jury as to all of their claims so triable.

Dated: September 22, 2025                    Respectfully submitted,


/s/ Robert K. Jenner
Robert K. Jenner (Bar No. 04165)
Kathleen R. Kerner (Bar No. 18955)
**JENNER LAW, P.C.**
3600 Clipper Mill Road, Ste. 240
Baltimore, Maryland 21211
Phone: (410) 413-2155
Fax: (410) 982-0122
rjenner@jennerlawfirm.com
kkerner@jennerlawfirm.com

*Attorneys for the Plaintiff*